CITY OF MARSHALL and Texas Commission on Environmental Quality, Petitioners,

v.

CITY OF UNCERTAIN, Caddo Lake Area Chamber of Commerce and Tourism, Greater Caddo Lake Association, Caddo Lake Institute, John T. Echols and Barry L. Bennick, Respondents.

No. 03–1111.

Supreme Court of Texas.

Argued Oct. 21, 2004.

Decided June 9, 2006.

Rehearing Denied Dec. 15, 2006.

R. Lambeth Townsend, Lloyd Gosselink Blevins Rochelle & Townsend, P.C., Martha S. Dickie, Minton Burton Foster & Collins, Martin C. Rochelle, Lloyd Gosselink Blevins Rochelle, George Thomas Bohl, Cynthia Woelk, Brian E. Berwick, Greg Abbott, Barry Ross McBee, Edward D. Burbach, Karen Watson Kornell, Office of Attorney General, Austin, for Petitioners.

Richard W. Lowerre, Lowerre & Kelly, Craig T. Enoch, Winstead Sechrest & Minick, P.C., Austin, Beth Ann Blackwood, Koledey, Thomas & Blackwood, Tom Max Thomas II, Dallas, for Respondents.

R. Glenn Jarvis, Law Offices of Glenn Jarvis, McAllen, Aric Kurtis Short, Molly Cagle, David P. Blanke, Vinson & Elkins L.L.P., Roger P. Nevola, Law Offices of Roger P. Nevola, Austin, Frank R. Booth, Aransas Pass, Jonathan D. Pauerstein, Loeffler Tuggey Pauerstein Rosenthal LLP, San Antonio, P.M. Schenkkan, Graves Dougherty Hearon & Moody, P.C., Timothy L. Brown, Austin, for Amicus Curiae.

Justice O'NEILL delivered the opinion of the Court.

In 1986, the City of Marshall received a certificate of adjudication recognizing a right to divert and use up to 16,000 acre-feet of water from Cypress Creek for municipal use, meaning that the water it supplied had to be potable. In 2001, the City

applied to the Texas Commission on Environmental Quality [1] to change the purpose of use in its certificate so that it could supply untreated water for industrial use. The City's application did not request a change in the amount of water or rate of diversion. The City of Uncertain and others opposed the application, alleging the amendment would have serious adverse environmental and socio-economic consequences, and sought a contested-case hearing. The Commission concluded that section 11.122(b) of the Texas Water Code mandated approval of the amendment without a contested-case hearing. We must decide whether that provision precludes a contested-case hearing when a proposed water-rights amendment requests a change in use but does not seek to increase the amount of water appropriated or the rate of diversion. We conclude that, while section 11.122(b) significantly restricts the issues that may be reviewed in a contested-case proceeding, it does not altogether preclude one. Depending upon the particular amendment application, a hearing may be necessary to allow the Commission to assess certain limited criteria other than the application's effect on other *water-rights holders and the onstream environment* that the Legislature considered necessary to protect the public interest, including assessment of water conservation plans, consistency with the state and any approved regional water plans, and groundwater effects. Accordingly, we affirm the court of appeals' judgment in part and remand to the Commission for further proceedings.

## I. Background

The City of Marshall is located in Harrison County, Texas, which is located partially within the Cypress Creek Basin and partially within the Sabine River Basin. Marshall received a permit in 1947 from the Texas Board of Water Engineers, a predecessor of the Texas Commission on Environmental Quality, authorizing Marshall to divert 7,558 acre-feet of water per year from Cypress Creek. Almost a decade later, the permit was amended to authorize an additional 8,442 acre-feet diversion. In 1986, Marshall received a certification of adjudication [2] from the Commission under the Water Rights Adjudication Act [3] recognizing its right to divert a total of 16,000 acre-feet of water for municipal use per year. The Commission's rules define "municipal use" as "the use of potable water within a community or municipality and its environs for domestic, recreational, commercial, or industrial purposes." 30 TEX. ADMIN. CODE § 297.1(32). It is undisputed that Marshall has never used more than half of its authorized amount of water.

In 2001, Marshall applied to the Commission for a permit amendment authorizing it to change the purpose of use so that it could supply untreated water for industrial purposes. The record suggests that Marshall was negotiating to sell the water to a power company and possibly to other

---

1. At the time, the agency was named the Texas Natural Resource Conservation Commission (TNRCC). The name was changed to the Texas Commission on Environmental Quality in 2002. *See* 27 Tex. Reg. 8340 (2002). When we refer to "the Commission" in this opinion, we refer to the Texas Commission on Environmental Quality and its predecessor agencies.

2. With limited exceptions, water rights in Texas are currently recognized in certificates of adjudication or permits. For ease of reference, we use the term permit to refer to both certificates of adjudication and permits.

3. As discussed further below, the Water Rights Adjudication Act was designed to unify various legal water rights systems. TEX. WATER CODE §§ 11.301–.341.

industrial users. Marshall also sought recognition of its historical practice of providing water to customers in the portion of Harrison County located within the Sabine River Basin in addition to its existing authorization to provide water to customers within the Cypress Creek Basin. Hundreds of individuals and organizations filed requests for notice and hearing on the application, including the City of Uncertain, the Greater Caddo Lake Association, the Caddo Lake Institute, the Caddo Lake Area Chamber of Commerce, John Echols, and Barry Bennick (collectively, "Uncertain"), respondents in this Court. Uncertain asserted that the application posed a serious threat to Big Cypress Bayou and Caddo Lake, which has been designated by the state and federal governments as a wetland of international importance. Tourism centered around Caddo Lake is a significant component of the City of Uncertain's local economy, and the other opponents and their constituents either operate businesses, own land, hold water rights, or reside downstream from Marshall's point of diversion. Uncertain asserted that the amendment would impair existing water rights and adversely affect the public welfare. It also contended that the application was inconsistent with the regional water plan and that Marshall's objectives in seeking the amendment could be met through conservation measures. In addition, Uncertain argued that there were indications of a hydrological relationship between Caddo Lake and groundwater resources that the Commission was required to consider under the Commission's rules. *See* 30 TEX. ADMIN. CODE § 297.47(a).

The Commission's executive director determined that neither of Marshall's requested amendments required notice and hearing.[4] The director concluded that section 11.085(v)(4) of the Water Code exempted the requested change in basin of use from notice and hearing requirements.[5] He also concluded that notice and hearing were not required for the requested change in use, reasoning that section 11.122(b)'s "full use" assumption mandated authorization of the change. TEX. WATER CODE § 11.122(b). The full-use assumption, also known as the four-corners doctrine, requires the Commission to assess a requested amendment's impact on other water rights and the on-stream environment based upon the full amount of water authorized by the existing permit irrespective of the amount that the permit holder has actually used. *See id.* The executive director granted Marshall's application in March 2002, and the Commission denied Uncertain's appeal of that decision. *See* 30 TEX. ADMIN. CODE § 55.201.

Uncertain appealed to the district court, naming the Commission and Marshall as defendants. Uncertain sought a temporary restraining order and temporary injunction to prevent Marshall from selling untreated water for industrial use pending disposition of the lawsuit, and also sought

---

4. The Commission did hold a public meeting to receive comments on the application, which hundreds of permit opponents and dozens of supporters attended, although the meeting occurred before the application was declared administratively complete.

5. Section 11.085(a) of the Water Code prohibits the use of state water from one river basin in another basin without Commission authorization. Sections 11.085(b)-(u) of the Water Code set out procedures governing interbasin transfer authorization proceedings. Section 11.085(v)(4) provides that those procedures do not apply to "a proposed transfer from a basin to a county or municipality or the municipality's retail service area that is partially within the basin for use in that part of the county or municipality and the municipality's retail service area not within the basin."

reversal of the executive director's decision to grant the permit without allowing a contested-case hearing. Uncertain further alleged that the approval violated several Water Code provisions and its right to due process under Article I, sections 17 and 19 of the Texas Constitution. The parties filed cross-motions for summary judgment; the trial court granted Uncertain's motion and denied Marshall's and the Commission's, holding that the Commission erred in its determination that the Water Code mandated approval of the amendment without a contested-case hearing.

The court of appeals affirmed in part, and reversed in part the trial court's judgment. 124 S.W.3d 690. The court held that section 11.085(v)(4) of the Water Code did not require a hearing on Marshall's request to change its permitted basin of use, *id.* at 696, but that section 11.122(b) allowed a hearing on Marshall's request to change the purpose of use, *id.* at 698. The court further held that notice and hearing were required under sections 11.132 and 11.133 of the Water Code. *Id.* We granted the Commission's and Marshall's petitions for review to determine section 11.122(b)'s effect on section 11.132 and 11.133 notice and hearing requirements when a proposed permit amendment changes the permit's purpose of use but does not affect the amount of water appropriated or the authorized diversion rate. Uncertain does not contest the court of appeals' decision that no hearing was required on Marshall's change-in-basin-of-use request, so that issue is not before us.

## II. Discussion

Before addressing the parties' arguments regarding section 11.122(b)'s import,

it is helpful to consider the statute's origin in the context of the development of water law in Texas. That development illustrates the Legislature's continuing efforts to properly conserve and manage this increasingly vital resource.

### A. Water Law Background

Surface water[6] in Texas is generally owned by the State of Texas and held in trust for the public, and the preservation and conservation of water resources are "public rights and duties." TEX. CONST. ART. XVI, § 59; TEX. WATER CODE § 11.021(a); FRANK F. SKILLERN, 1 TEXAS WATER LAW SERIES 29 (1992). Current laws governing Texas surface-water rights have grown out of "a hodgepodge of historical and contradictory water rights systems." Robin A. Melvin, *Transferring Water Rights in Texas,* in 14.1, THE CHANGING FACE OF TEXAS WATER RIGHTS IN TEXAS 2003 ( State Bar of Texas 2003).

### 1. Spanish, Mexican, and Common Law

Spanish or Mexican law governed water rights granted before Texas gained independence in 1836. Under that body of law, a landowner had no right to use surface water unless the land grant specifically provided for it. *Id.; State v. Valmont Plantations,* 346 S.W.2d 853 (Tex.Civ. App.—San Antonio 1961), *aff'd,* 163 Tex. 381, 355 S.W.2d 502 (1962). After independence, the Republic of Texas adopted the common law of England except to the extent it was specifically abrogated by statute. SKILLERN, *supra,* at 29. England's system of riparian rights, as adapted by this Court, allowed owners of lands

---

6. By "surface water," we refer to "the ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico and the storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state ...." TEX. WATER CODE § 11.021(a).

adjacent to streams to use such water for irrigation of riparian lands as was reasonable under the circumstances. *See Watkins Land Co. v. Clements,* 98 Tex. 578, 86 S.W. 733, 735 (1905); Melvin, *supra,* at 1; SKILLERN, *supra,* at 35–36. The riparian system, though, proved ill-suited to more arid parts of the state, leading the Legislature to enact the Irrigation Acts of 1889 and 1895. Act of Mar. 19, 1889, 21st Leg., R.S., ch. 88, 1889 Tex. Gen. Laws 100; Act of Mar. 9, 1895, 24th Leg., R.S., ch. 21, 1895 Tex. Gen. Laws 21.

## 2. The Irrigation Acts

The Irrigation Acts of 1889 and 1895 preserved previously recognized riparian rights to some extent, but also allowed the acquisition of appropriative water rights in certain parts of the state. Act of Mar. 19, 1889, 21st Leg., R.S., ch. 88, §§ 1, 9, 1889 Tex. Gen. Laws 100, 101; Act of Mar. 9, 1895, 24th Leg., R.S., ch. 21, §§ 1, 3, 1895 Tex. Gen. Laws 21, 22. The Irrigation Acts provided that a water right was acquired by diverting water and applying it to a beneficial purpose. Act of Mar. 19, 1889, 21st Leg., R.S., ch. 88, § 1, 1889 Tex. Gen. Laws 100, 100; Act of Mar. 9, 1895, 24th Leg., R.S., ch. 21, § 1, 1895 Tex. Gen. Laws 21, 21. Under the appropriative system, the right to divert water in times of shortage is determined by the seniority of the appropriation—as between appropriators, first in time is first in right.[7] TEX. WATER CODE § 11.027; Act of Mar. 19, 1889, 21st Leg., R.S., ch. 88, § 4, 1889 Tex. Gen. Laws 100, 101; Act of Mar. 9, 1895, 24th Leg., R.S., ch. 21 § 5, 1895 Tex. Gen. Laws 21, 21–23. The Irrigation Acts contemplated that any rights acquired would be recorded by filing a sworn statement with the county clerk. Act of Mar. 9, 1889,

21st Leg., R.S., ch. 88, § 5, 1889 Tex. Gen. Laws 100, 101; Act of Mar. 19, 1895, 24th Leg., R.S., ch. 21, §§ 6, 8, 1895 Tex. Gen. Laws 21, 22. Appropriative rights under the Irrigation Acts were acquired without any assessment of environmental impacts or water availability. Under the 1895 Act, new riparian rights were no longer recognized in the arid parts of the state except for domestic purposes. Act of Mar. 19, 1895, 24th Leg., R.S., ch. 21, § 1, 1895 Tex. Gen. Laws 21, 21.

In 1913, Texas continued to refine its ability to manage its water resources by creating a permit system administered by the Board of Water Engineers, a Commission predecessor. Act of Apr. 9, 1913, 33rd Leg., R.S., ch. 171, § 7, 1913 Tex. Gen. Laws 358, 359. Under that system, the Board was empowered to grant or deny permits for new rights, subject to notice and hearing. *Id.* §§ 15, 20–23, 1913 Tex. Gen. Laws 358, 364–65. Rights acquired under the Irrigation Acts were to be recorded and filed with the Board, but failure to file did not extinguish previously perfected appropriative rights. *Id.* § 14. The existence of unrecorded but valid riparian and appropriative rights led to uncertainty and clashes between conflicting claims in times of water shortages, leading the Legislature to further action.

## 3. The Water Rights Adjudication Act

In 1967, the Legislature enacted the Water Rights Adjudication Act to unify the dual systems of riparian and appropriative rights. TEX. WATER CODE §§ 11.301–341. The Act required water-rights claimants to file claims with the Board's successor, the Texas Water Rights Commission, based upon the amount of water applied to beneficial use between 1963 and 1967.

---

7. For example, the Commission's order granting Marshall's amendment assigns a time priority of April 18, 1947 for 7,558 acre-feet of the water to be used for municipal purposes, and a priority of November 27, 1956 for an additional 8,442 acre-feet.

The Commission conducted adjudicative hearings throughout the state, and the courts ultimately approved its decisions. *See, e.g., In re the Adjudication of the Water Rights of Upper Guadalupe Segment of Guadalupe River Basin,* 642 S.W.2d 438, 443 (Tex.1982). The adjudication process did not weigh the environmental impacts of the claimants' historic use. *See* TEX. WATER CODE §§ 11.301–324. The certificate of adjudication that Marshall sought to amend was obtained in this process.

While the adjudication process resulted in a unitary system of defined rights, many river basins in the state were overappropriated because the rights recognized were based upon historic use rather than water availability. H. RESEARCH ORGANIZATION, No. 75–13, TEXAS AT A WATERSHED: PLANNING NOW FOR FUTURE NEEDS (April 15, 1997). A severe drought in the mid–1990s drew the Legislature's attention once again to water-supply issues. *Id.* at 3.

#### 4. Senate Bill 1

In response to the Legislature's directive that "those policies and action required to meet Texas's near and long-term water needs" be identified, the Commission, the Texas Water Development Board, and the Texas Parks and Wildlife Department prepared a state water plan that projected huge increases in water demands in the next 50 years. *See* TEXAS WATER DEVELOPMENT BOARD, WATER FOR TEXAS TODAY & TOMORROW: LEGISLATIVE SUMMARY OF THE 1996 CONSENSUS–BASED UPDATE OF THE STATE WATER PLAN 1 (1997). The plan noted that the opportunities to develop new reservoirs were limit-

ed by high costs and serious environmental issues, and recommended a number of measures to meet Texas's growing needs, including legislation to encourage conservation, planning, reuse, and the transfer and marketing of water rights. *Id.* at 4–7. The Legislature enacted many of those measures in Senate Bill 1, a landmark in natural-resource legislation and the source of section 11.122(b) of the Water Code, which forms the basis of the parties' dispute in this case.

#### B. The Water Code and Contested–Case Hearings

The parties assert differing interpretations of the Water Code's notice and hearing requirements when a holder of permitted water rights seeks to amend the permit. We begin by considering the Water Code's notice and hearing requirements and other pertinent criteria that the parties agree are mandatory for approval when an applicant seeks a new appropriation of state water.

#### 1. Appropriative Permit Requirements

The right to use and divert state water is "acquired by appropriation in the manner and for the purposes provided in [the Water Code]." TEX. WATER CODE § 11.022. The Code contains a number of procedural and substantive requirements that an application to appropriate unappropriated state water must meet. The procedural criteria relate generally to the form of the application, the necessary fee, and notice and hearing. *Id.* §§ 11.124, 11.125, 11.128, 11.132, 11.133, 11.134(b)(1). More substantively, the applicant must show that

(3) the proposed appropriation

(A) is intended for a beneficial use [8];

---

8. The Water Code defines "beneficial use" as "the amount of water which is economically

necessary for a purpose authorized by [Chapter 11 of the Code] when reasonable intelli-

(B) does not impair existing water rights or vested riparian rights;

(C) is not detrimental to the public welfare;

(D) considers the assessments performed under Sections 11.147(d) and (e) [effects on bays and estuaries and instream uses] and Sections 11.150 [effects on water quality], 11.151 [effects on groundwater], and 11.152 [effects on fish and wildlife habitats]; and

(E) addresses a water supply need in a manner that is consistent with the state water plan and the relevant approved regional water plan for any area in which the proposed appropriation is located, unless the commission determines that conditions warrant waiver of this requirement; and

(4) the applicant has provided evidence that reasonable diligence will be used to avoid waste and achieve water conservation as defined by Subdivision (8)(B), Section 11.002.

*Id.* § 11.134(b)(3)-(4). The applicant is also required to "provide[ ] evidence that reasonable diligence will be used to avoid waste and achieve water conservation as defined by Subdivision (8)(B), Section 11.002." *Id.* § 11.134(b)(4). In sum, the substantive components that currently must be assessed when an applicant seeks a new appropriation of water are comprehensive, and sections 11.132 and 11.133 of the Water Code provide that notice and hearing must be afforded to those who may be affected by the proposed appropriation. *Id.* §§ 11.132, 11.133.

We note that Marshall's certificate of adjudication was based upon water rights initially granted in permits issued by the Commission in 1947 and 1956. At the time the permits were issued, the Commission could reject an application to appropriate water only if there was no unappropriated water in the source of supply, or if the proposed use conflicted with existing water rights or would be detrimental to the public welfare. *See* Act of May 10, 1943, 48th Leg., R.S., ch. 303, 943 Tex. Gen. Laws 455 (1943). And certificates of adjudication under the Water Rights Adjudication Act took into account only the amount of water beneficially used without waste in any given year during a specified time period. TEX. WATER CODE § 11.303(b). In contrast, the current Water Code and its implementing regulations require the Commission, in assessing new permit applications, to consider a proposed appropriation's impact on bays and estuaries and in-stream uses, effects on water quality and groundwater, effects on fish and wildlife habitat, as well as its consistency with the state and any regional water plans. *Id.* §§ 11.134(b)(3)(D), (E). Consequently, in a December 20, 2001 letter to the Commission, the Texas Parks & Wildlife Department complained that "no environmental assessment was required or performed at the time [Marshall's] original permit was granted" and, as far as it could discern, "no comprehensive review of [Marshall's] application has been performed to determine whether the City's application complies with section 11.134."

The parties do not dispute the requirements that are necessary to initially acquire an appropriative water-rights permit. But they part ways over the process that governs an application to amend a water-rights permit when no additional water is sought to be appropriated and the diversion rate is unaffected. Section 11.122 governs amendments to permitted

---

gence and reasonable diligence are used in applying the water to that purpose and shall include conserved water." TEX. WATER CODE § 11.002(4).

water rights, and we now turn to its provisions.

### 2. Water–Rights Amendments

#### a. Section 11.122(b)

Section 11.122(b) of the Water Code provides:

> Subject to meeting all other applicable requirements of this chapter for the approval of an application, an amendment, except an amendment to a water right that increases the amount of water authorized to be diverted or the authorized rate of diversion, shall be authorized if the requested change will not cause adverse impact on other water right holders or the environment on the stream of greater magnitude than under circumstances in which the permit, certified filing, or certificate of adjudication that is sought to be amended was fully exercised according to its terms and conditions as they existed before the requested amendment.

TEX. WATER CODE § 11.122(b).

 In construing this statute, our primary objective is to ascertain and give effect to the Legislature's intent. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex.2003)(citing *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002)). We look first to the plain and ordinary meaning of the statute's words. *Id.* (citing *State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex.2002)). A statute that uses the term "shall" imposes a duty "unless the context in which the word or phrase appears necessarily requires a different construction." TEX. GOV'T CODE § 311.016. "[W]e presume that every word of a statute has been included or excluded for a reason . . . ." *Old Am. County Mut. Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111, 115 (Tex.2004). "It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous." *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex.2003); *see also* TEX. GOV'T CODE § 311.021(2). If necessary, we may consider other factors, including the law's objective, legislative history, and the consequences of a particular construction. *McIntyre*, 109 S.W.3d at 745; *Tex. Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 21 (Tex.1996).

Section 11.122(b)'s plain language mandates authorization of a proposed water-rights amendment that does not increase the amount of water authorized to be diverted or the authorized diversion rate, but it also contains a number of conditional clauses through which the mandate must be viewed:

> *Subject to meeting all other applicable requirements of this chapter for the approval of an application,* an amendment . . . shall be authorized *if the requested change will not cause adverse impact on other water right holders or the environment on the stream of greater magnitude than [if the certificate were being fully used]* . . . .

TEX. WATER CODE § 11.122(b) (emphasis added). Not surprisingly, the parties rely on different clauses and interpretations to support their respective positions.

Marshall and the Commission direct their focus on the full-use assumption. They claim the Legislature enacted section 11.122 in 1975 to give the Commission authority to adopt rules that would govern amendments to water rights, thus taking water-rights amendments out of section 11.132–11.134s' purview and allowing the Commission to determine which amendment applications required notice and hearing and which did not. By enacting subsection (b) in 1997, they contend, the

Legislature sought to streamline the amendment process even further by removing Commission discretion to deny an amendment that did not seek to appropriate additional water or increase the authorized diversion rate beyond the full use already permitted. According to Marshall and the Commission, section 11.122(b)'s predicate language subjecting an amendment's approval to "all other *applicable* requirements of this chapter for the approval of an application" refers merely to matters they assert are not tied to a new appropriation of water, such as payment of a filing fee, administrative completeness, and provision of a conservation plan. *Id.* § 11.122(b) (emphasis added). Applying all of the section 11.132–11.134 criteria to permit amendments, they claim, would thwart the Legislature's intent to streamline the amendment process.

Uncertain's primary focus is section 11.122(b)'s predicate language—"[s]ubject to meeting *all* other applicable *requirements* of this chapter for the approval of an application . . . ." TEX. WATER CODE § 11.122(b) (emphasis added). Uncertain argues that the term "application" includes amendment applications, and that "all" requirements for approval of a new appropriation apply equally to amendments like Marshall's that request a change in the purpose of use, including the substantive and procedural requirements contained in sections 11.132–11.134. According to Uncertain, section 11.122(b)'s full-use assumption only restricts the parameters of the Commission's review of those elements specified in that section, namely that the proposed amendment "will not cause adverse impact on other water right holders or the environment on the stream," and does not exempt the applicant from meeting all other section 11.132–11.134 requirements. *Id.* But even if the full-use assumption does preclude the Commission's consideration of all other factors, Uncer-

tain argues, assessing the proposed amendment's impact on other water-rights holders and the on-stream environment involves a factual determination upon which a contested-case hearing must be afforded.

Each of the parties' arguments finds some support in the statutory language. As Marshall points out, section 11.132, which requires the Commission to give notice and hearing to persons potentially affected by an application, refers to the "proposed use" and "proposed appropriation" in describing the required contents of the notice. *Id.* § 11.132(b), (c)(3). By referring to the "proposed appropriation," the notice and hearing provisions suggest they apply to water to which a right has not been previously recognized under a permit or certificate of adjudication. *See Lower Colo. River Auth. v. Tex. Dep't of Water Res.*, 689 S.W.2d 873, 874, 880–82 (Tex.1984) (holding that section 11.025 of the Water Code, which provides that water that has not been beneficially used is considered "not appropriated," does not apply to the determination of whether unappropriated water is available under section 11.134(b)(2) of the Code). On the other hand, as Uncertain argues and the court of appeals noted, the Legislature has expressly stated in other sections of the Water Code when notice and hearing are not required yet chose not to include comparable language in section 11.122(b), suggesting that notice and hearing are required for proposed water-rights amendments because they are not expressly excluded. 124 S.W.3d at 698 n. 13.

■ While the parties' arguments have some textual support, neither gives full effect to section 11.122(b)'s statutory language. Uncertain glosses over the term "[s]ubject to meeting all other *applicable* requirements of this chapter for the approval of an application"; "applicable"

must mean something less than all requirements necessary for an original permit else section 11.122(b)'s purpose to streamline the amendment process would have no effect. TEX. WATER CODE § 11.122(b) (emphasis added). On the other hand, Marshall's position that the subject-to clause refers only to administrative form and content requirements has no support in the text or the legislative history, not to mention the ease with which the Legislature could have said "subject to meeting all *administrative* requirements for the approval of an application" had it so intended. Contrary to the parties' diametrically opposed interpretations, we believe all of section 11.122(b)'s language can be given effect without undermining the statute's overall purpose to streamline the amendment application process.

In denying notice and hearing on Marshall's permit amendment application, the Commission concluded that section 11.122(b) mandated authorization of the amendment and left no factual issues to be resolved in an evidentiary hearing.[9] That interpretation presumes, we believe incorrectly, that the only relevant criteria governing an amendment's disposition are contained in section 11.122(b) itself, *i.e.*, that the requested change does not adversely impact other water-rights holders or the on-stream environment any more than would full use of the permitted right.

It is clear, as the Commission believed, that the Legislature did intend to make the amendment process less cumbersome by imposing the full-use restriction on the assessment of adverse impacts on other water rights and the on-stream environment. But the Legislature's intent in enacting section 11.122(b) and other portions of Senate Bill 1 was also to protect the public welfare by otherwise ensuring protection of this valuable resource.

As we have noted, the Legislature sought in Senate Bill 1 to comprehensively address the State's present and future water-supply needs. Toward this end, Senate Bill 1 implemented a number of steps to make better use of existing supplies, including measures to facilitate water-rights transfers and marketing, to encourage conservation, to protect groundwater resources, and to encourage systematic water-resource planning.[10] While section 11.122(b) simplified the permit amendment process to facilitate water-rights marketing by curtailing certain assessments under the full-use assumption, other provisions of Senate Bill 1 specifically require applicants for both new and amended water rights to submit water conservation plans and direct the Commission to assess an amendment application's consistency with the state water plan and any approved regional plan. Act of June 1, 1997, 75th Leg., R.S., ch. 1010, § 1.03, 1997 Tex.

9. In a letter to former Lieutenant Governor Bill Ratliff, who had inquired whether the Commission had authority to grant a request for a public hearing, the executive director noted that "[s]ection 11.132 of the Texas Water Code does not entirely preclude the possibility of notice and opportunity for a contested case hearing, but providing that opportunity would contradict the structure and language of the statute" because section 11.122(b) limited the Commission's discretion to deny or condition approval of the amendment. Letter from Jeffrey A. Saitas, Executive Dir., Tex. Natural Res. Conservation Comm'n, to the Honorable Bill Ratliff, Lieutenant Governor of Texas (Nov. 13, 2001) (R. at 314).

10. As we have noted, those steps were recommended by the three state agencies charged with water resource responsibility: the Commission, the Texas Water Development Board, and the Texas Parks and Wildlife Department. *See* TEXAS WATER DEVELOPMENT BOARD, WATER FOR TEXAS TODAY & TOMORROW: LEGISLATIVE SUMMARY OF THE 1996 CONSENSUS BASED–UPDATE OF THE STATE WATER PLAN 1 (1997).

Gen. Laws 3610, 3616 (amended 1999, 2001) (current version at TEX. WATER CODE § 11.134(b)(3)(D),(E)); TEX. WATER CODE §§ 11.1271(a), 11.1501. Section 11.134(b)(3)(D), as implemented through section 297.47 of the Commission's implementing regulations, also requires the Commission to assess an amendment application's effect on groundwater use, quality, or recharge. Act of June 1, 1997, 75th Leg., R.S., ch. 1010, § 4.01, 1997 Tex. Gen. Laws 3610, 3633 (current version at TEX. WATER CODE § 11.134(b)(3)(D)); 30 TEX. ADMIN. CODE § 297.47. Marshall and the Commission's contention that any application that does not increase the amount or rate of diversion must be approved irrespective of these effects would undermine the Code's public-welfare purpose as reflected in section 11.122(b)'s "subject-to" clause.

Section 11.122(b)'s predicate clause requires that an amendment application meet "all other applicable requirements of this chapter for the approval of an application." TEX. WATER CODE § 11.122(b). All *other* requirements of the chapter can only mean those that do not concern section 11.122(b)'s specific criteria, *i.e.*, assessment of "adverse impact on other water right holders or the environment on the stream." Those requirements are described as follows in section 11.134(b); for ease of illustration, those criteria that section 11.122(b) excludes or that clearly do not apply to amendments are indicated and explained in bold text:

> (b) The commission shall grant the application only if:
> (1) the application conforms to the requirements prescribed by this chapter and accompanied by the prescribed fee;

> (2) *unappropriated water is available in the source of supply [the amendment here seeks no new appropriation, but would instead allow Marshall to use previously appropriated water for a different purpose]*;
> (3) the proposed appropriation:
>> (A) is intended for a beneficial use; [11]
>> (B) *does not impair existing water rights or vested riparian rights [full-use assumption applies to impacts on other water-rights holders under section 11.122(b) ]*;
>> (C) is not detrimental to the public welfare;
>> (D) *considers the assessments performed under Sections 11.147(d) and (e) [effects on bays and estuaries and in-stream uses] and Sections 11.150 [effects on water quality]*, 11.151 [effects on groundwater],[12] *and 11.152 [effects on fish and wildlife habitats]; [full-use assumption applies to these on-stream effects under section 11.122(b) ]*; and
>> (E) addresses a water supply need in a manner that is consistent with the state water plan and the relevant approved regional water plan for any area in which the proposed appropriation is located, unless the commission determines that conditions warrant waiver of this requirement; and
> (4) the applicant has provided evidence that reasonable diligence will be used to avoid waste and achieve water conservation as defined by Subdivision (8)(B), Section 11.002.

---

11. As previously noted, the term is defined as the nonwasteful use of water for a purpose recognized under the Water Code.

12. As already noted, the Commission's implementing regulations make the assessment of groundwater effects applicable to permit amendment applications. 30 TEX. ADMIN. CODE § 297.47.

TEX. WATER CODE § 11.134(b). In sum, the "other applicable requirements" that do not implicate effects on other water-rights holders or the on-stream environment concern conformance with administrative requirements, beneficial use of the water right, protection of the public welfare, groundwater effects, consistency with the state and any applicable regional water plan, avoidance of waste, and achievement of water conservation. *Id.*

The legislative history that we have described, as well as the history of the Commission's authority over water-rights amendments and section 11.122(b)'s place in the general regulatory scheme, comports with this interpretation.

### b. Commission's Authority

The Legislature enacted the legislation that became section 11.122 of the Water Code in 1975. Act of May 22, 1975, 64th Leg., R.S., ch. 472, § 1, 1975 Tex. Gen. Laws 1249. That legislation resolved long-standing jurisprudential questions about the Commission's authority over changes to water rights. In 1947, the Austin court of appeals had held that a water-rights permit holder was required to obtain permission from the Board of Water Engineers to change the permitted purpose and place of use of the water right. *Clark v. Briscoe Irrigation Co.*, 200 S.W.2d 674, 682 (Tex.Civ.App.—Austin 1947, no writ). Twenty-five years later, the same court held that an irrigation district was *not* required to obtain the agency's approval to change the use of water rights reflected in the district's certified filing. *Nueces County Water Control & Improvement Dist. No. 3 v. Tex. Water Rights Comm'n*, 481 S.W.2d 930, 933 (Tex.Civ.App.—Austin 1972, writ ref'd n.r.e.). The court distinguished *Clark* on the ground that the case had involved a permit rather than a certified filing:

The rationale of *Clark* ... is that the necessity for obtaining approval of the Commission to change the authorized place or purpose of use of water under a *permit* is implied from the statutory policy and requirements relating to the grant of a permit in its original form, including the Commission's approval of the original place and purpose of use. Those reasons are absent in the instance of a certified filing since the State's approval of the place and purpose of use was not required in initiating a certified filing.

*Id.* The court's decision in *Nueces County* prompted the Legislature to adopt the legislation embodied in sections 11.122(a) and (c), which made clear that "[a]ll holders of permits, certified filings, and certificates of adjudication" are required to obtain agency permission to alter a water right in any way. *See* Act of May 22, 1975, 64th Leg., R.S., ch. 472, § 1, 1975 Tex. Gen. Laws 1249 (current version at TEX. WATER CODE § 11.122(a)). The Legislature directed the Commission to adopt rules to effectuate the statute. *Id.* (current version at TEX. WATER CODE § 11.122(c)). In accordance with that mandate, the Commission adopted procedural rules governing amendment applications, as well as rules incorporating substantive Water Code criteria for the approval of amendments.

### c. Commission Rules

In response to the Legislature's directive, the Commission adopted the predecessor to its current rules governing notice and hearing for applications to amend water rights. *See* Texas Water Rights Commission, Rule 129.06.05.001 (1975) (available at the Texas Commission on Environmental Quality). That rule, like the Commission's current rule, did not require notice and hearing on every amend-

ment application.[13] *Id.* The current rule provides:

> Only an application to amend an existing permit ... which does not contemplate an additional consumptive use of state water or an increased rate or period of diversion and which, in the judgment of the commission, has no potential for harming any other existing water right, is subject to amendment by the commission without notice other than that provided to the record holder. Upon filing such an application, the commission shall consider whether additional notice is required based on the particular facts of the application.

30 TEX. ADMIN. CODE § 295.158(c)(1). Thus, a proposed amendment that contemplates no additional consumptive water use or increase in the rate or period of diversion, and that lacks potential to harm other existing water rights, is presumptively not subject to notice and hearing, although the rule contemplates that the Commission may determine additional notice and hearing is required "based on the particular facts of the application." *Id.; see generally* 30 TEX. ADMIN. CODE § 295.171.[14]

The substantive rules that the Commission adopted under section 11.122(c) and other Water Code provisions require assessment of a number of factors when considering an application to amend an existing water-rights permit. Those rules were amended in 1999, largely in response to Senate Bill 1. In amending the rules,

the Commission differentiated between criteria pertaining to an amendment's impact on other water rights and the on-stream environment, and other particular section 11.134 criteria. Criteria concerning the former include the "no injury" rule, 30 TEX. ADMIN. CODE § 297.45, water-quality effects, *id.* § 297.54, estuarine considerations, *id.* § 297.55, and in-stream uses, *id.* § 297.56. While these substantive criteria must be assessed when an applicant seeks a new appropriation of water, and notice and hearing must be afforded to those who may be affected, their assessment is constrained by the full-use assumption for an amendment of that appropriation. This constraint significantly reduces the criteria that must be assessed for a permit amendment, thereby streamlining the amendment process as section 11.122(b) intended.

Other Commission rules specifically require the Commission to consider other section 11.134 criteria unconstrained by section 11.122(b)'s full-use assumption. These include the public welfare, groundwater effects, the adequacy of a water conservation plan, and consistency with the state water plan and any approved regional plan. *Id.* §§ 297.41(a)(3)(C), (E), 297.46, 297.47.

█ In sum, we interpret section 11.122(b) to require the Commission to assess specified criteria other than impacts on other water-rights holders and the on-stream environment when considering a

---

13. Commentators have similarly agreed that notice and hearing on water-rights amendments are not always required. *See, e.g., Ronald A. Kaiser, Texas Water Marketing in the Next Millenium: A Conceptual and Legal Analysis*, 27 TEX. TECH L. REV. 181, 245 (1996); Melvin, *supra*, at 5; SKILLERN, *supra*, at 110.

14. The language of 30 Tex. Admin. Code § 295.158 appears to establish a fairly flexible standard for notice and hearing on water

rights amendments. In oral argument before this Court and, according to Uncertain, before the court of appeals, the Commission has acknowledged that at least some amendment applications would be subject to notice and hearing, and, as we discuss below, the Commission took the position in adopting certain rules that the full-use assumption would not constrain it with respect to certain regulatory criteria.

proposed water-rights amendment. Marshall has a specifically defined right to fully use the amount of water identified in its permit, but it has no right to use that water other than as conditioned. *See* TEX. WATER CODE § 11.135(a)("[The water right] is limited to the extent and purposes stated in the permit."). The Legislature has determined that the Commission must approve alterations in water rights like the change in purpose of use that Marshall seeks in its amendment. *Id.* § 11.122(a). If removal of the potability restriction from Marshall's permit would adversely impact the limited public-interest criteria that the Legislature carved out of section 11.122(b), then holding a contested-case hearing to determine those specific effects comports with the Legislature's overall purpose to protect this valuable resource. On the other hand, if it is apparent from the application that those limited public-interest criteria are not adversely impacted, then no hearing on the application would be required. We emphasize, however, that in evaluating an amendment application seeking a change in use, the Commission must focus on the impacts that are inherent in the type of use that is proposed, and not on the fact that the applicant may fully use its permitted water right.

### 3. Notice and Hearing

 The question remains whether notice and hearing are necessary to assess the Marshall amendment application's compliance with these other criteria. In general, the Commission should be able to evaluate an amendment's effect on other water-rights holders and the on-stream environment without the need for a formal evidentiary hearing, although certainly nothing would prohibit the Commission from holding a hearing if there appear to be disputed issues relevant to determining those effects. 30 TEX. ADMIN. CODE §§ 295.158(c)(1), 295.71. A hearing would be required, for example, if other water-rights holders or the on-stream environment were affected beyond or irrespective of the full-use assumption. For instance, if the amendment moved the point of diversion upstream above a senior right holder, it could affect that person's diversion of water even if the applicant's amount and rate of diversion were unchanged. Or if the use changed from a nonconsumptive use to a consumptive one, the amount returned to the stream would decrease and could affect downstream right holders, again irrespective of the full-use assumption or the rate of diversion. In situations like these, the Commission would be required to provide notice and hearing.

Uncertain claims that assessing Marshall's proposed amendment as it relates to these effects involves a factual determination upon which a contested-case hearing must be afforded. We cannot tell from the record before us whether Uncertain claims that other water rights or the on-stream environment would be adversely affected beyond or irrespective of Marshall's full use of the permitted right. If that determination can be made from the face of the application, then notice and hearing would not be required as to those elements; if it cannot, then a limited hearing would be necessary to assess those effects.

The same is true for the other applicable requirements that we have discussed. It may generally be possible for the Commission to determine from the face of a proposed amendment that the relevant criteria are met or are not implicated by a particular amendment application, in which event a hearing would not be necessary. But if an issue is raised as to these effects, a hearing should be afforded to assess them. We see no reason why notice and

hearing must be afforded to assess these effects before water is appropriated, *see* TEX. WATER CODE §§ 11.132, 11.133, but not when the purpose of use is later sought to be changed in a manner that might impact these considerations that the Legislature and the Commission deemed necessary to protect the public interest. In this case, Uncertain and numerous others, including the Texas Parks and Wildlife Department and the Commission's Office of Public Interest Counsel, raise a number of substantive issues not cabined by the full-use assumption, including the proposed amendment's impact on public welfare, groundwater, and the adequacy of Marshall's conservation plan. If the Commission is unable to assess these criteria from Marshall's amendment application, then notice and hearing would be required under the Water Code and Commission rules.

Several amici[15] argue that subjecting water-rights amendments to the time and expense of contested-case hearing procedures will discourage the development of needed supplies. As we read the Water Code and the Commission's implementing rules, however, the issues that are subject to hearing have been considerably narrowed by the elimination of significant potentially contentious issues that generally require complex hydrological analysis. *See generally* DOUGLAS G. CAROOM ET AL., 45 TEXAS PRACTICE: ENVIRONMENTAL LAW § 14.4 (Jeff Civins, Jimmy Alan Hall, & Mary K. Sahs eds., 2d ed.2005); Robert J. Brandes, *Why Do Surface Water Availability Mod-*

*els Matter to Your Client?*, THE CHANGING FACE OF WATER RIGHTS IN TEXAS (State Bar of Texas 2004); *Lower Colo. River Auth.*, 689 S.W.2d 873. Under the full-use assumption, an amendment's impact on other water rights and the on-stream environment, including the issues of habitat mitigation, water-quality effects, estuarine considerations, and in-stream uses, can in most instances be determined from a facial review of the permit application without an evidentiary hearing. Moreover, application of the full-use assumption may substantially limit the pool of potential parties[16] to a contested-case hearing. At the same time, any limited hearing that may be required gives effect to other provisions of Senate Bill 1 and Chapter 11 of the Water Code that the Legislature considered necessary to protect the public interest and preserve this valuable resource.

### III. Conclusion

We conclude that section 11.122(b) does not mandate issuance of Marshall's water-rights amendment without the assessment of other substantive criteria imposed by the Water Code and the Commission's rules. From what we have said, it may be that persons affected by these substantive criteria are entitled to notice and hearing to determine the proposed amendment's effect, or it may be that the Commission could determine from the application that these criteria are not impacted and a hearing is not necessary. We believe that the Commission should make this determina-

---

15. We have received amicus briefs from the Guadalupe–Blanco River Authority, the San Antonio Water Systems, the Texas Irrigation Council, and the Texas Water Conservation Association urging us to reverse the court of appeals' judgment as it pertains to section 11.122(b) of the Water Code. The Coastal Conservation Association, Texas, and the Texas Wildlife Association ask us to affirm.

16. "An affected person is one who has a personal justiciable interest related to a legal right, duty, privilege, power or economic interest affected by the application." *Collins v. Tex. Natural Res. Conservation Com'n*, 94 S.W.3d 876, 882 (Tex.App.—Austin 2002, no pet.) (citing 30 TEX. ADMIN. CODE § 55.29(a)).

tion in light of our construction of section 11.122(b). We therefore affirm the court of appeals' judgment in part, although for different reasons, and remand to the Commission for further proceedings.