**Opinion filed May 23, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00030-CV

_____

**TEXAS WATER DEVELOPMENT BOARD, Appellant**
**V.**
**WARD TIMBER, LTD.; WARD TIMBER HOLDINGS;**
**SHIRLEY SHUMAKE; GARY CHEATWOOD; RICHARD**
**LETOURNEAU; AND PAT DONELSON**, **Appellees**

**On Appeal from the 126th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-GN-11-000121**

## O P I N I O N

The issue, one of first impression, is whether there is an "interregional conflict" between the 2011 water plans of two regions that are now part of the Texas water plan. The Texas Water Development Board (the Board) is required by State law to adopt a comprehensive state water plan every five years that incorporates approved regional plans. TEX. WATER CODE ANN. § 16.051(a) (West Supp. 2012). The Board has divided the State into sixteen planning regions.

Regional planning groups must submit their plans to the Board no less than once every five years; the first plans were due on January 5, 2001. *Id.* § 16.053(i). Section 16.053(h)(7)(A) of the Water Code provides that the Board may approve a regional water plan only after it has determined that "all interregional conflicts involving that regional water planning area have been resolved."

The 2011 regional water plan for the North Central Texas Regional Planning Area (Region C) included a proposed Marvin Nichols Reservoir in the Sulphur River Basin of the North East Texas Regional Planning Area (Region D) as a future source of water for Region C. Region C includes Fort Worth and Dallas. Region D's 2011 water plan provided detailed reasons why the impact of that proposed reservoir on Region D's timber, agricultural, environmental, and other natural resources constituted an interregional conflict with Region C's plan. The Board approved the Region D plan on October 14, 2010, and the Region C plan on December 16, 2010. When the Board approved each plan, it expressly found that there was no interregional conflict.

Appellees, landowners and members of the Region D planning group, sued under TEX. WATER CODE ANN. § 6.241 (West 2008) and, as a suit for declaratory judgment, under TEX. GOV'T CODE ANN. § 2001.038 (West 2008), seeking judicial review of the Board's decision approving Region C's water plan. They contended that, because of the "interregional conflict" between the two plans, Section 16.053 of the Water Code prohibited the Board from approving the Region C plan until the conflict was resolved. The Board filed a plea to the jurisdiction, arguing lack of standing and sovereign immunity, and contended that there was not an interregional conflict under the Board's definition of an "interregional conflict." By definition, an interregional conflict exists only when more than one regional water plan relies on the same water source and there is insufficient water to fully

implement both plans. 31 TEX. ADMIN. CODE § 357.10(15) (2012) (Tex. Water Dev. Bd., Regional Water Planning, Definitions).

The district court denied the Board's plea to the jurisdiction, declared that an interregional conflict existed between the two water plans, reversed the Board's decision approving the two plans, and remanded the case to the Board for it to follow its rules and the statute to resolve the conflict. We affirm.

*The Board's Issues on Appeal*

The Board presents three issues: (1) whether the district court erred in denying the Board's plea to the jurisdiction; (2) whether the district court erred in declaring that an "interregional conflict" existed between Region C and Region D and declaring that the Board's interregional conflict rules applied to the conflict; and (3) whether the district court erred in reversing the Board's approval of the 2011 Regional Water Plan for Region C and remanding the case back to the agency.

*Background Facts*

The Texas Water Development Board, created by the state constitution, is the state agency primarily responsible for water planning and for administering water financing for the state. TEX. CONST. art. III, § 49-c; WATER § 6.011 (West 2008). There is a constitutional duty to conserve water as a precious resource. TEX. CONST. art. XVI, § 59(a). To regulate and control this precious resource, the legislature created an administrative and regulatory agency known as the Texas Commission on Environmental Quality (the Commission), previously known as the Texas Natural Resource Conservation Commission. WATER § 5.001(2); *Tex. Water Rights Comm'n v. Wright*, 464 S.W.2d 642 (Tex. 1971); 73 TEX. JUR. 3d *Water* § 9 1990).

In 1997, the legislature changed the way Texas plans for its water future. Instead of the "top-down" approach previously used, the legislature passed Senate Bill 1 to build the state water plan through a "bottom-up" process. This new process relies, to a large degree, on regional planning. Act of June 1, 1997, 75th Leg., R.S., ch. 1010, 1997 Tex. Gen. Laws 3610.

As the water planning agency for Texas, the Board must adopt a comprehensive state water plan every five years that incorporates approved regional water plans. WATER § 16.051(a). Regional planning groups develop the regional plans and must submit their adopted plans to the Board not less than once every five years. *Id.* § 16.053(i). The Board reviews and approves regional water plans under Section 16.053. Once they are approved, the Board combines the sixteen regional plans into a state water plan that is intended to assure that future water needs will be met while protecting significant natural and agricultural resources and economic interests of the regions.

Chapter 16 of the Texas Water Code and the Board's rules provide guidance to the sixteen regional planning groups. Some items that the Board's rules required planning groups to address in regional plans at the time of the trial court's decision are listed in the Board's reply brief:

- A description of the regional planning area that takes into account water providers, use, water quality problems, water sources, socio-economic data, drought preparedness, and a host of other factors;

- Current and projected population and water demands;

- The adequacy of existing water supply for use in the drought of record;

- A water supply analysis for the drought of record;

- Identified water strategies to meet demands during the drought of record;

- An evaluation of the water management strategies that the planning group identifies;

- Specific detailed recommendations of water management strategies;

- Regulatory, administrative or legislative recommendations that the planning group believes are needed for drought response; and

- *Descriptions of the major impacts of recommended strategies on water quality, agricultural resources, natural resources in general, as well as financial demands and other implications of the strategies.*

*See* former 31 TEX. ADMIN. CODE § 357.7(a)(1)–(14) (Tex. Water Dev. Bd., Regional Water Plan Development) *repealed* 37 Tex. Reg. 5797 (2012) (effective Aug. 12, 2012).

After the district court's decision, the Board repealed its water planning rules that were in effect and adopted new rules. 37 Tex. Reg. 5797 (effective date August 12, 2012). The Board's current rules also require regional planning groups to address the impacts of recommended strategies on agricultural and natural resources. *See* 31 TEX. ADMIN. CODE §§ 357.30, 357.34(d)(3)–(7), 357.35(c), 357.40, 357.41 (2012) (Tex. Water Dev. Bd., Regional Water Planning). Section 357.41 provides that the planning group must describe how its regional plan is "consistent with the long-term protection of the state's water resources, agricultural resources, and natural resources as embodied in the guidance principles in § 358.3(4) and (8) of this title (relating to Guidance Principles)."

Section 16.053(a) of the Water Code requires that a regional plan provide for the development of water resources in preparation for and in response to drought

conditions in order that sufficient water will be available at a reasonable cost to ensure public health, safety, and welfare; to further economic development; and to protect the agricultural and natural resources of that particular region. Likewise, Title 31, Section 358.3 of the Administrative Code provides that development of the regional water plans and the state water plan shall be guided by the principles listed in that section, one of which is that "[c]onsideration of all water management strategies [shall be] consistent with long-term protection of the state's water resources, agricultural resources, and natural resources." 31 TEX. ADMIN. CODE § 358.3(9) (2012) (Tex. Water Dev. Bd., State Water Planning Guidelines) (formerly 31 TEX. ADMIN. CODE § 358.3(b)(4)).

The Board may approve a regional water plan only after it has determined that all interregional conflicts involving that regional water planning area have been resolved. WATER § 16.053(h)(5). If there is an interregional conflict, the Board must first attempt to resolve the conflict through a dispute resolution process involving the regions. WATER § 16.053(h)(6). If the conflict cannot be resolved by the regions, the Board is required to resolve the conflict. *Id.* Section 16.053(h)(7) provides for Board approval:

> (7) The board may approve a regional water plan only after it has determined that:
>
> (A) all interregional conflicts involving that regional water planning area have been resolved;
>
> (B) the plan includes water conservation practices and drought management measures incorporating, at a minimum, the provisions of Sections 11.1271 and 11.1272; and
>
> (C) the plan is consistent with long-term protection of the state's water resources, agricultural resources, and

6

natural resources as embodied in the guidance principles adopted under Section 16.051(d).

In 2010, the Board approved the 2011 regional water plans for the North Central Texas Regional Planning Area (Region C) and for the North East Texas Regional Planning Area (Region D). The Region C water plan recommended water management strategies, including water conservation and reuse, three new major reservoirs (Marvin Nichols Reservoir was one), and utilization of other surface water sources. If implemented, the recommended strategies would provide approximately 2.3 million acre-feet per year of additional water supply by the year 2060: water for the projected population increase from 6,670,493 in 2010 to 13,045,592 by 2060. In recommending approval of the Region C water plan, the Board's staff stated that it had reviewed the Plan for interregional conflicts and found none.

The regional water plan for Region D was prepared by the planning group with Bucher, Willis, & Ratliff Corporation and various engineering firms. Chapter 7.0 described how the Region D plan was consistent with the long-term protection of the state's water resources, agricultural resources, and natural resources as required by the Administrative Code. Chapters 7.0 and 8.0 addressed the impact of the Marvin Nichols Reservoir on the long-term protection of those resources, concluding that it was "the position of the [North East Texas Regional Water Planning Group] that inclusion of the Marvin Nichols I Reservoir [was] not consistent with the long-term protection of the State's water resources, agricultural resources, and natural resources."

Subchapter 8.13.1 of the Region D plan points out that the 2005 Region D planning group had also concluded that the proposed Marvin Nichols Reservoir was not consistent with protecting the timber, agricultural, environmental, and other natural resources and third parties in the Region D area. According to

Appellees, the Board ignored Region D's concerns about the overall impact of the proposed Marvin Nichols Reservoir during that earlier planning cycle.

Subchapters 7.6.1 and 7.6.2 of the 2011 Region D plan discussed the impact on agricultural resources and the timber industry. It was estimated that the Marvin Nichols Reservoir would flood 66,000 to 70,000 acres, mainly in Red River County but also in portions of Bowie, Titus, and Morris Counties. Included in the flooded acreage would be 33,000 to 53,000 acres of forest lands, including Priority 1 bottomland hardwoods and wetlands. Besides the timber and agricultural land that would be lost due to the reservoir, mitigation requirements were anticipated to greatly impact agricultural resources. After a detailed study, the Texas Parks and Wildlife Department and the United States Fish and Wildlife Service Study concluded that a minimum of 163,620 acres would be required for mitigation and that the number could be as high as 648,578 acres. In a March 2003 report prepared for the Sulphur River Basin Authority, Weinstein and Clower in "The Economic, Fiscal and Developmental Impacts of the Proposed Marvin Nichols Reservoir Project" estimated an agricultural land loss of 165,000 to 200,000 acres. The Region D water plan contains more discussion of the probable impacts should the Marvin Nichols Reservoir be built. Even at the planning stage, it is evident that the impacts would be substantial.

Despite the impact findings in Region D's water plan and Region D's contention that there were interregional conflicts, the Board accepted and approved Region C's plan. The Board expressly found that there were no interregional conflicts. Appellees seek only the opportunity for the Region D water planning group to negotiate with the Region C water planning group, under the guidance of the Board, to see if there is a more acceptable alternative to Region D than the Marvin Nichols Reservoir. The district court found that Region C's water strategy

8

of building the Marvin Nichols Reservoir was an interregional conflict with Region D's long-term protection of Region D's water resources, agricultural resources, and natural resources. Therefore, the district court reversed the Board's approval of the Region C water plan and remanded this case to the Board for it to follow the procedures in Section 16.053(h)(6) of the Water Code:

> If an interregional conflict exists, the board shall facilitate coordination between the involved regions to resolve the conflict. If conflict remains, the board shall resolve the conflict. On resolution of the conflict, the involved regional water planning groups shall prepare revisions to their respective plans and hold, after notice, at least one public hearing at some central location within their respective regional water planning areas. The regional water planning groups shall consider all public and board comments; prepare, revise, and adopt their respective plans; and submit their plans to the board for approval and inclusion in the state water plan.

Appellees state that the purpose of their suit is only to require the Board to follow the procedures in Section 16.053(h)(6). Their purpose is not to fix property rights; it is to have the Board resolve conflicts with a goal of a more complete and balanced water plan. Appellees point out that "Region D has identified other areas in [Region D] where additional water and even reservoirs could be developed or expanded to provide water for other regions without the economic and other losses the [Region D planning] group projects for the Marvin Nichols site."

*Summary of the Two Views of Water Planning*

The Board characterizes the planning process as identifying water supply needs for the uses specified in its rules and identifying possible strategies to meet those needs. The Board contends that the conflicts raised by Appellees may be addressed when the Commission begins the permitting process for the actual building of the Marvin Nichols Reservoir; that, therefore, Appellees have no standing for judicial review of the Board's approval of the two plans because the

reservoir may never be built; and that Appellees cannot show harm to their rights at this point. The Board does not deny there is a conflict in the respective plans concerning the Marvin Nichols Reservoir; it takes the position this is not a conflict within the meaning of Section 16.053 of the Texas Water Code. The Board defines an "interregional conflict" under Section 16.053 as arising when "more than one regional water plan attempts to rely upon the same water source, so that there is not sufficient water available to fully implement both plans and would create an over-allocation of that source." 31 ADMIN. § 357.10(15).

The Board further reasons that Appellees are concerned with the impact on Region D's resources if the Marvin Nichols Reservoir is built for Region C's water supply, a concern that does not involve a "use" of water from the proposed Marvin Nichols Reservoir. *See* former 31 ADMIN. § 357.7. The Board points out that Appellees are not arguing Region D wants water from the proposed Marvin Nichols Reservoir for one of those uses.

Appellees contend that the Board's position defeats the purpose of Section 16.053 of the Texas Water Code, the regional water planning statute that directs regional planning groups to identify and recommend strategies for water use while protecting significant agricultural and natural resources. The text of Chapter 16 reflects the intent of the legislature that conflicts between regions involving a proposed water strategy and its effect on resources should be addressed as early as possible. Appellees point out that the Board in the 2007 state water plan requested the legislature to fund the purchase of the Marvin Nichols Reservoir site. The legislature complied, designating Marvin Nichols as a unique reservoir site. WATER § 16.051(g-1); *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 475 (Tex. 2012). Under the Board's view, the Commission would not address the fundamental conflicts posed here until after the funding is provided and the

permitting process is underway. Appellees assert that the Board's position will waste time, effort, and money as opposed to the simple statutory procedure the legislature has provided for the Board to follow.

The Board focuses on regulatory policy and regulatory decisions, stating that "[n]either the development nor the approval of a regional water plan is regulatory in nature. Approval of a regional plan does not fix the legal rights of a person seeking a permit for a project, nor those of an affected person seeking to support or protest a project." Appellees agree because they are not seeking to have any rights fixed. Appellees point out that this is not a suit that would impose liability on the Board. They seek only to have the Board follow the statutory guide that encourages regional planning groups to resolve conflicts through negotiation. Appellees are only challenging the Board's approval of the two plans because the Board omitted the requisite procedural steps to resolve an interregional conflict before approving the plans.

The Board states that "Appellees approach in this case appears to be based on the erroneous assumption that the planning process is the functional equivalent of a permit hearing." We do not understand that to be Appellees' approach. Appellees only want the Board to follow Section 16.053 of the Water Code and the Board's own rules as reflected in former 31 TEX. ADMIN. CODE § 357.14 and give the two regions an opportunity to negotiate alternatives to the proposed Marvin Nichols Reservoir. The Administrative Code provided in relevant part:

> (8) In the event the board finds that an interregional conflict exists between adopted regional water plans, the executive administrator *shall*:
>
> > (A) notify the affected regional water planning groups of the nature of the interregional conflict;

11

(B) request affected regional water planning groups assistance in resolving the conflict; and

(C) negotiate resolutions of conflicts with regional water planning groups and other interested parties as determined by the executive administrator.

(9) In the event negotiations conducted under paragraph (8) of this subsection to resolve conflicts between adopted regional water plans are unsuccessful, the executive administrator shall:

(A) determine a proposed recommendation for resolution of the conflict;

(B) provide notice of its intent to hold a public hearing on proposed recommendations for resolution of the conflict by publishing notice of the proposed change in the Texas Register.

Former 31 ADMIN. § 357.14 (emphasis added).

We note that, in the current 31 TEX. ADMIN. CODE § 357.62, the Board has changed the wording to "the [executive administrator] *may* use" the negotiating process (emphasis added). In the event that the Board has to resolve the interregional conflict, the current Section 357.62 provides that "[t]he Board's decision is final and not appealable."

Appellees acknowledge that Region D will need to provide more water to Region C besides the substantial amounts of water it already provides. Their desire is for the Region D planning group to have a mediated negotiation with Region C because of the impact the Marvin Nichols Reservoir would have on Region D.

In its reply brief, the Board states:

[I]f the case were remanded for TWDB to attempt to resolve the alleged interregional conflict, the most the law affords them is another opportunity to make public comments on the regional plan. . . . Since

12

> the Water Code does not provide Appellees with any additional input into the process other than the ability to make additional comments, there is no guarantee that a remand will remedy the harm they claim.

Section 16.053(h)(6) of the Water Code provides that "the board shall facilitate coordination between the involved regions to resolve the conflict." Resolving a conflict does not mean that one side makes a few comments. Former 31 TEX. ADMIN. CODE § 357.14 and current 31 TEX. ADMIN. Code § 357.62 appropriately interpret the statute to mean that the Board will help the regions "negotiate" a resolution. Negotiating involves the sharing of information between the two regions. Appellees recognize that it will be the Region D water planning group that will negotiate for Region D.

## *Jurisdictional Issues*

In the first issue, the Board argues that the district court erred in denying its plea to the jurisdiction. The Board argues that (1) there is no statute authorizing judicial review of the Board's decision in approving Region C's water plan, (2) there is no waiver of sovereign immunity, and (3) Appellees have no standing to seek judicial review of the Board's decision. It is important to keep in mind this is not an appeal to review the merits of the Board's decision in approving a regional water plan, which would involve the substantial evidence rule.[1] The appeal involves the issue of whether the Board reached its decision without complying with one of the statutory requirements. The applicability of that statutory requirement turns on whether there was an "interregional conflict" between the two plans.

---

[1]*See Tex. Water Comm'n v. Dellana*, 849 S.W.2d 808 (Tex. 1993), where the supreme court held that Section 5.351 of the Texas Water Code authorizes judicial review of the Commission decisions, but only after a party has exhausted all available administrative remedies.

*Standing*

Sovereign immunity and standing are separate issues. In their petition, Appellees provided a summary of their interests to demonstrate their standing to sue for judicial review under Section 6.241 of the Texas Water Code and to seek a declaratory judgment under Section 2001.038 of the Texas Government Code that there was an interregional conflict between the two water plans that required resolution before the Board approved the two plans. Ward Timber, Ltd. and Ward Timber Holdings (Ward Timber) are companies involved in the development of forest products in Region D. Ward Timber has over 100 employees and harvests approximately 100,000 tons of timber each year on lands within the Sulphur River Basin where the Marvin Nichols Reservoir site is located. Ward Timber claimed that it would be adversely affected by the construction of the proposed Marvin Nichols Reservoir because the reservoir would inundate a substantial amount of that timberland.

Shirley Shumake owns land that would be flooded by one of the proposals for the Marvin Nichols Reservoir; she is also a past and current member of the Region D water planning group. She claimed that the Region C water plan adversely affected her property values and her ability to plan for the productivity of her ranch operations. Gary Cheatwood also owns land that would be flooded by the Marvin Nichols Reservoir. He was a member of the Region D water planning group. Richard LeTourneau also owns land that would be flooded; he was a member of the Region D water planning group and served as chairman of the group. Pat Donelson owns the Cross Arrow Ranch; a substantial part of the ranch would be inundated by the Marvin Nichols Reservoir.

Appellees alleged that the Board's approval of the Region C water plan impairs Appellees' ability to borrow money or make investments on their property

within the proposed site of the Marvin Nichols Reservoir. Investment decisions for planting trees, timber harvesting, and agricultural endeavors depend on whether the Marvin Nichols Reservoir remains a unique reservoir site and a viable strategy. All of the Appellees participated in the Region D planning process. Appellees recognize that negotiations may fail and that the Board may resolve the conflict in favor of Region C. However, Region D will have had an opportunity at the planning stage to present alternative strategies to Region C that may have a lesser impact on Region D.

Texas law traditionally required a claimant to possess a common-law or a statutory right of action or, in public rights cases, to have a personal interest in the enforcement of the public right because the claimant has suffered or is threatened with some damage peculiar to himself. William V. Dorsaneo, III, *The Enigma of Standing Doctrine in Texas Courts*, 28 REV. LITIG. 35 (2008). In 1993, Texas replaced the traditional ideas with federal standing doctrine and elevated the law of standing to jurisdictional status in *Texas Association of Business v. Texas Air Control Board*, 852 S.W.2d 440, 445–46 (Tex. 1993). Article III of the United States Constitution limits federal judicial power to resolving "Cases" and "Controversies"; thus, a lack of standing deprives a federal court of subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Professor Dorsaneo points out that the adoption of the federal standing doctrine has complicated Texas procedural law because it has embraced a complex body of federal constitutional law without clearly explaining "whether a claimant must possess a legal injury resulting from the breach of a legal duty, or whether some other type of interest or injury is sufficient to satisfy Texas's standing requirements." Dorsaneo, *The Enigma of Standing Doctrine in Texas Courts*, 28 REV. LITIG. at 36. He points out that the Texas Supreme Court recognized that the

federal standing doctrine has both prudential and jurisdictional components and stated that "[t]his Court has not indicated whether standing is always a matter of subject-matter jurisdiction." *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 9 n.16 (Tex. 2008).

This case would appear to be one where standing arguably should not be a matter of subject-matter jurisdiction. Our analysis, however, will follow Texas jurisprudence regarding challenges to governmental action. Viewing standing as a component of subject-matter jurisdiction, we consider it as we would a plea to the jurisdiction, construing the pleadings in favor of the plaintiffs. *Brown v. Todd*, 53 S.W.3d 297, 305 n.3 (Tex. 2001).

The United States Supreme Court, applying standing principles that are analogous to this situation, explained that the "irreducible constitutional minimum" of standing consists of three elements:

- the plaintiff must have suffered an "injury in fact—an invasion of a "legally protected" interest that is concrete and particularized and that is actual or imminent, not conjectural or hypothetical;

- the injury must be fairly traceable to the challenged action of the defendant and not the independent action of a third party not before the court; and

- it must be likely, not merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61; *see Good Shepherd Med. Ctr., Inc. v. State*, 306 S.W.3d 825, 833 (Tex. App.—Austin 2010, no pet.); *Save Our Springs Alliance, Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 878 (Tex. App.—Austin 2010, pet. denied).

An "injury in fact" is conceptually distinct from whether the plaintiff has incurred a "legal" injury (a viable cause of action on the merits). *See Hunt v. Bass*,

664 S.W.2d 323, 324 (Tex. 1984); *Good Shepherd Med. Ctr.*, 306 S.W.3d at 833. And, the required infringement of a "legally protected" interest does not necessarily have to rise to the level of depriving the plaintiff of a "vested right" to violate due process. *Good Shepherd Med. Ctr.*, 306 S.W.3d at 833. But a plaintiff must show it has or imminently will suffer an invasion of some "legally protected" interest sufficiently unique to the plaintiff, as distinguished from the general public. *Id.*

The Board argues that (1) Appellees do not have an "injury in fact" because the Marvin Nichols Reservoir may never be built; (2) Appellees cannot trace the Board's approval of the two regional plans to any actual, imminent, concrete or particularized harm suffered by them; and (3) the Board's approval decision did not fix rights or obligations and, therefore, this case does not involve a justiciable controversy and will result in an advisory opinion.

Appellees argue that they have standing because they are challenging the Board's approval of Region C's plan only because of its inaction on the interregional conflict, "not [the] future construction of the Marvin Nichols [R]eservoir." Appellees' alleged harm results from the Board's failure to recognize and resolve the interregional conflict between Regions C and D. Appellees assert that Texas case law includes several instances involving challenges to governmental decisions analogous to the challenge involved here. We agree their cited cases have merit.

Appellees cite *Hays County v. Hays County Water Planning Partnership*, 106 S.W.3d 349 (Tex. App.—Austin 2003, no pet.), where the court of appeals considered the standing of an association (the Partnership) to challenge Hays County's approval of a transportation plan submitted to the Capital Area Metropolitan Planning Organization (CAMPO) by Hays County. CAMPO

17

coordinates transportation planning and approves use of federal transportation funds for a large area that includes Hays County. 106 S.W.3d at 353. The Partnership asserted that the submitted plan had been altered after the meeting approving the plan, resulting in the county's submission to CAMPO of a substantially different plan from that adopted at the meeting. The court of appeals held that the Partnership had standing because a "published intention for future roadway development" in an area covered by a transportation plan was enough to cause "potential and immediate economic loss" to association members. *Id.* at 357.

The harm in *Hays* is not dissimilar from the harm to Appellees here. Region C's water plan is incorporated in the state water plan. The Board's approval of the state water plan impairs Appellees' ability to invest in property improvements. By the Board's action, the Marvin Nichols Reservoir site has been designated by the legislature as a "unique reservoir site." *See* WATER § 16.051(g-1). Requesting millions from the legislature for purchasing the Marvin Nichols Reservoir site expresses a "published intention" for that reservoir to be built in the future. The Board first designated the Marvin Nichols Reservoir as a reservoir site in the state water plan in 1968. *Hearts Bluff Game Ranch*, 381 S.W.3d at 474. That was long before the comprehensive regional water planning required by Chapter 16 that tasks each region to identify interregional conflicts or potential conflicts. *See* WATER § 16.053(h)(5).

In *Shackelford v. City of Abilene*, 585 S.W.2d 665 (Tex. 1979), the supreme court refused to construe the "particularized harm" requirement narrowly. Shackelford, a reporter for a local television station, sought to enjoin the Abilene Equal Employment Opportunity Board from holding closed meetings where the board was considering allegations of discrimination against a city employee. 585 S.W.2d at 667. Shackelford alleged that the closed meetings violated the city

charter's provision requiring open meetings. The court of appeals held that the reporter did not have standing because he did not have a particular interest different from the general public. *Id.* Reversing, the supreme court held that, under the city charter, Shackelford had standing "as a citizen of Abilene." *Id.* at 668. In this case, Appellees have interests separate from the general public in seeing that the Board follows the procedures in Chapter 16 for eliminating interregional conflicts.

The case of *Dillard Texas Operating Limited Partnership, L.P. v. City of Mesquite*, 168 S.W.3d 211 (Tex. App.—Dallas 2005, pet. denied), is also instructive on the issue of standing in the type of case now before us. Dillard appealed the trial court's grant of a plea to the jurisdiction in its case against the City of Mesquite and a waste hauler. Dillard contended that the city had illegally entered into an exclusive contract for waste management and that Dillard should not be required to use that provider. 168 S.W.3d at 213. The appellate court held that Dillard had standing to sue, seeking a declaratory judgment that Mesquite violated its charter by granting the waste hauler exclusive rights to haul commercial waste, and that the trial court had subject-matter jurisdiction and erred in granting the plea. *Id.* at 215. Citing *Shackelford*, the court rejected the argument of Mesquite and the waste hauler that Dillard did not have standing because Dillard had not incurred a "particularized injury" or harm distinct from any allegedly incurred by the general public. *Id.* at 214. The court also rejected Mesquite's argument that there was no justiciable controversy.

In *Housing Authority of City of Harlingen v. State*, 539 S.W.2d 911 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.), occupants of a low-income housing project sought an injunction and other relief contending the city housing authority did not have the right to make monthly $50 lump sum payments to each

commissioner of the authority for undocumented expenses. The court held that the occupants had standing to challenge the authority's right to make the payments and that the payments were not authorized by the "Housing Authorities Law" (then TEX. REV. CIV. STAT. art. 1269k (repealed 1987)). 539 S.W.2d at 917.

In summary, first, Appellees own property interests affected by both water plans; that sets them apart from the general public interest in the Board following its procedures. Second, their alleged "injury in fact" results from the Board's failure to recognize and resolve the alleged interregional conflict; that failure impacts their property because it denies Region D an opportunity to resolve the conflict with Region C. Third, their injury probably will be redressed by a favorable court decision to have the regions resolve the conflict or the Board resolve the conflict. The trial court did not err in finding that Appellees had standing to sue and that their suit involved a justiciable controversy. Like the reporter in *Shackelford* seeking to compel the Abilene board to follow the Open Meetings Act and the city charter, Dillard seeking to compel the City of Mesquite to void a contract with a waste hauler in violation of the city charter, and the occupants in *City of Harlingen* contending the local housing authority was making unauthorized payments to the commissioners, Appellees seek to have the regions or the Board resolve what Appellees argue is an interregional conflict under the statute.

We turn next to the Board's claim that Appellees' suit is barred by sovereign immunity.

*Statutory Waiver of Sovereign Immunity*

Appellees contend that Section 6.241 of the Water Code and Section 2001.038(a) of the Government Code authorize judicial review of the Board's action in ignoring the statute on interregional conflicts and further support

their standing to challenge the Board's action. Appellees argue that Section 6.241 and Section 2001.038(a) waive sovereign immunity for Board administrative decisions where the suit is not for money damages from the State. We agree.

This is a case of first impression addressing Section 6.241 of the Water Code; it has not been the subject of a Texas case. Section 6.241 provides that a person may seek judicial review of a "ruling, order, decision, or other act" of the Board. The Board claims that Section 6.241 does not waive sovereign immunity and that, therefore, the case should be dismissed for lack of subject-matter jurisdiction.

The Board argues that the statutory scheme negates the availability of judicial review under Section 6.241 in this case. If a groundwater conservation district disagrees with how the Board resolved a conflict between its approved groundwater management plan and an approved state water plan, Section 16.053(p) authorizes the district to seek judicial review of the Board's decision. By contrast, the Board points out, Chapter 16 does not provide for judicial review of the Board's decisions on interregional conflicts. Because the legislature did not provide a judicial review provision in Chapter 16, the Board contends that "[t]here simply is no clear and unambiguous waiver of immunity under Texas Water Code § 6.241 for the type of lawsuit that the Appellees have brought."

We disagree with the Board's position that judicial review of the Board's actions under Chapter 16 is limited to a conflict between a groundwater management plan and the state's water plan. Section 6.241, entitled "Judicial Review of Acts," contains the following provisions:

> (a) A person affected by a ruling, order, decision, or other act of the board may file a petition to review, set aside, modify, or suspend the act of the board.

21

(b) A person affected by a ruling, order, or decision of the board must file his petition within 30 days after the effective date of the ruling, order, or decision. A person affected by an act other than a ruling, order, or decision must file his petition within 30 days after the date the board performed the act.

(c) *Orders, decisions, or other actions of the board pursuant to Subchapters E and F of Chapter 16* and to Chapter 17 of this code are not subject to appeal (footnote omitted, emphasis added).

There would be no reason for the legislature to except subchapters E and F of Chapter 16 unless the legislature meant for Section 6.241 to apply to orders, decisions, or other actions of the Board under the remaining subchapters of Chapter 16. We hold that Section 6.241 applies to rulings, orders, decisions, or other acts of the Board under Section 16.053 (which are not in subchapter E or F), including the Board's final approval of a regional water plan. We see no reason to ignore the plain text of Section 6.241.

Section 5.351 of the Texas Water Code provides for judicial review of Commission acts and contains identical language to paragraphs (a) and (b) in Section 6.241. However, Section 5.351 does not have a paragraph (c). The Board points out that the Texas Supreme Court held in *Texas Natural Resource Conservation Commission v. IT-Davy*, 74 S.W.3d 849 (Tex. 2002), that Section 5.351 did not waive sovereign immunity. The Board argues, therefore, by analogy, that Section 6.241 also does not. IT- Davy had sued the Commission for additional payments under a contract with the Commission. The *IT-Davy c*ourt began its analysis with the reminder that sovereign immunity protects the state from lawsuits for money damages, citing *General Services Commission v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001). 74 S.W.3d at 853. IT-Davy sought money from the state; therefore, sovereign immunity was applicable. The

Board's attempt to analogize the *IT-Davy c*ourt's holding concerning Section 5.351 to the role of Section 6.241 in this case is not an appropriate analogy. The supreme court explicitly held that Section 5.351 did not waive sovereign immunity "under the facts" in *IT-Davy*. *Id.*

The more appropriate analogy is the role of Section 5.351 in providing for judicial review in cases involving permits. Section 5.351 allows "[a] person affected by a ruling, order, decision, or other act of the commission" to petition a Travis County trial court "to review, set aside, modify, or suspend the act of the commission." In cases involving permits, courts have found that Section 5.351 allows parties to sue following a final decision by the Commission; the courts have obviously recognized that Section 5.351 waives sovereign immunity in those cases provided the plaintiff has exhausted its administrative remedies. *See Tex. Water Comm'n v. Dellana*, 849 S.W.2d 808 (Tex. 1993) (Section 5.351 authorized judicial review of the Commission's decision to deny Hunter Industrial Facilities' application for hazardous waste disposal permit, but Hunter had not exhausted its administrative remedies); *City of Waco v. Tex. Comm'n on Envtl. Quality*, 346 S.W.3d 781 (Tex. App.—Austin 2011, pet. granted) (City is an affected person under Section 5.115(a) and can sue under Section 5.351 concerning a dairy's water permit application that would affect Lake Waco water quality.); *Tex. Comm'n on Envtl. Quality v. Kelsoe*, 286 S.W.3d 91 (Tex. App.—Austin 2009, pet. denied) (party not allowed to sue because he filed his judicial review petition late); *Heat Energy Advanced Tech., Inc. v. W. Dallas Coalition for Envtl. Justice*, 962 S.W.2d 288 (Tex. App.—Austin 1998, pet. denied) (Coalition of residents had standing to challenge facility's application for renewal permit.).

Here, the decision of the Board approving the water plans of Regions C and D is analogous to the Commission's decision involving a permit. The legislature

has not provided a separate administrative procedure for one region to challenge another region's plan. Region D's planning group followed the only administrative procedure available by pointing out the purported interregional conflict with Region C's plan and submitting its plan for approval. The Board issued a final decision when it approved Region C's water plan. Region D exhausted the administrative procedure before Appellees filed suit. We further note that Section 5.351 allows standing to sue following a final permit decision by the Commission. It follows that, by analogy, Section 6.241 allows standing to sue following a final decision by the Board in approving a water plan.

The Board's argument is that cases such as these show that Appellees' claims are not yet final—finality will occur in the permitting process under the Commission—and that an appeal following a final permit decision by the Commission is the appropriate forum for Appellees to seek redress for injury to their property rights. Appellees are not seeking such redress, only the resolution of the purported conflict. Appeal following a permit decision will be too late for a negotiation between Region C and Region D to see if there is an alternative water strategy that will not have the impact on Region D that the Marvin Nichols Reservoir site does.

The Board's position effectively means its definition of interregional conflict cannot be challenged. Yet, the Texas Supreme Court has stated that administrative orders are *final* and *appealable* if they impose an obligation, *deny a right*, or fix some legal relationship as consummating the administrative process. *City of Austin v. Tex. Comm'n on Envtl. Quality*, 303 S.W.3d 379, 384 (Tex. App.— Austin 2009, no pet.) (citing *Tex.–N.M. Power Co. v. Tex. Indus. Energy Consumers*, 806 S.W.2d 230, 232 (Tex. 1991)). The Board argues that there are only proposals for the Marvin Nichols Reservoir and that there are many

24

conditions that must be met before the reservoir becomes a reality. In *Texas–New Mexico Power Company*, the supreme court considered whether an order of the Public Utility Commission of Texas (PUC) conditionally approving a certificate of convenience and necessity for construction of a power plant was final and appealable. Because of the numerous conditions and restrictions imposed by the PUC, the trial court dismissed the administrative appeal for want of jurisdiction. The court of appeals affirmed, reasoning that the absence of "the necessary permits from the other agencies" made it impossible to know if the power company would obtain the approval of those agencies. 806 S.W.2d at 231. The supreme court reversed, holding that the order was final and reasoning that regulated parties and consumers must be afforded an opportunity for timely judicial review of actions that affect them. In determining finality, courts should consider the statutory context in which the agency operates. *Id.* at 232.

The Board's decision approving Region C's plan was a final decision for the planning process. Region D followed the administrative process for water planning in Chapter 16. The statutory context here, Section 16.053, requires regional groups to address a number of factors in their plans with emphasis on possible water strategies and the impact of the strategies on agricultural resources and natural resources. The Board misconstrues the purpose of Appellees' suit. It repeatedly argues that approval of a regional plan does not fix the legal rights of a person seeking a permit for a project or those of an affected person seeking to support or protest a project. True. But the only right Appellees seek here is their right, as Region D citizens directly affected, to have the Board follow the statute and its own rule requiring it to assist regions in negotiating a resolution where there is an interregional conflict.

25

Neither *Sun Oil Company v. Railroad Commission of Texas*, 311 S.W.2d 235 (Tex. 1958), nor *Moody v. Texas Water Commission*, 373 S.W.2d 793 (Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.), cited by the Board, is helpful. Prior to the enactment of the statute applicable in *Moody*, there was no statutory procedure whereby the views of the state could be given to Congress on a federal water impoundment project. 373 S.W.2d at 796. The appellate court in *Moody* found that the commission had complied with the requirements of the statute, that the governor had notified the federal agency of the action of the commission approving the feasibility of the project, and that the matter had become moot. *Id.* at 796–98. The statute was a narrow one that the court found provided no appeal for judicial review of the commission's decision.

*Sun Oil* also lacks relevance to this case. The railroad commission's order was the result of an investigation and expressed its view that certain truck movements into the state should be subject to higher intrastate rates if the shipper first stored the goods after they entered Texas and then subsequently delivered the goods to well sites; the intrastate rates should apply to the transportation after the goods were removed from storage. 311 S.W.2d at 236 n.2. The *Sun* court held that the order was not a final administrative order that was judicially reviewable because the order did not prevent Sun from contending the traffic in question to be interstate if the railroad commission ever proceeded against Sun. *Id.* at 297. The supreme court admitted that it was difficult to distinguish the order before it from that held reviewable in *Frozen Food Express v. United States*, 351 U.S. 40 (1956). *Id.* In the case before us, the Board has taken a final action with respect to approval of Region C's water plan; no further action is needed.

Section 2001.038 also provides statutory authority for the district court's judicial review of the Board's action. Section 2001.038(a) authorizes a declaratory judgment action to determine the "applicability of a rule":

> (a) The validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.

Section 2001.038 is a grant of original jurisdiction and waives sovereign immunity. *Tex. Logos, L.P. v. Tex. Dep't of Transp.*, 241 S.W.3d 105, 123 (Tex. App.—Austin 2007, no pet.); *Tex. Dep't of Human Servs. v. ARA Living Ctrs. of Tex., Inc.*, 833 S.W.2d 689, 693 (Tex. App.—Austin 1992, writ denied). The section also provides that "[a] court may render a declaratory judgment without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question." GOV'T § 2001.038(d).

Appellees sought a declaratory judgment regarding the applicability of the Board's former Rule 357.14 (currently Rule 357.50(j)(2)). Former Rule 357.14 required the Board to consider "information from regional water planning groups of the existence of an interregional conflict" and to find "that no interregional conflict exists" before approving a regional water management plan. Former 31 ADMIN. § 357.14(3). Current Rule 357.50 contains the same requirement. Where there is an interregional conflict, the Board must take steps to resolve it. *See* WATER § 16.053(h)(6).

The Board decided that the rules on resolving interregional conflicts did not apply to the type of conflict identified by the Region D planning group. Appellees contend that the rules do apply and that the unresolved interregional conflict should have prevented the Board from approving Region C's water plan until the

conflict between the two regional water plans was resolved. *See* WATER
§ 16.053(h)(7).

It is true that the state water plan recommends water strategies, some of which will not be built. A fair reading of the text of Chapter 16, however, indicates that the legislature meant for there to be a comprehensive planning process, balancing strategies against their impacts on agricultural, economic, and natural resources. Resolving interregional conflicts through negotiation is part of that balancing. As provided in Section 16.053(h)(7), the Board may approve a regional water plan only after it has determined that:

- all interregional conflicts involving that regional water planning area have been resolved;

- the plan includes water conservation practices and drought management measures incorporating, at a minimum, the provisions of Sections 11.1271 and 11.1272; and

- *the plan is consistent with long-term protection of the state's water resources, agricultural resources, and natural resources as embodied in the guidance principles adopted under Section 16.051(d)* (emphasis added).

Section 6.241 and Section 2001.038 provide for judicial review of the Board's order that approved Region C's plan under Chapter 16. The trial court did not err in denying the Board's plea to the jurisdiction. The first issue of the Board is overruled.

### *Does An Interregional Conflict Exist?*

In its second issue, the Board contends that the district court erred in declaring that an "interregional conflict" existed between Region C and Region D and declaring that the Board's interregional conflict rules applied to the conflict. Because the legislature did not define "interregional conflict," the issue is the

meaning of "interregional conflict" within the context of Chapter 16 of the Water Code.

The construction of a statute is a question of law we review de novo. *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011); *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008); *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). Our primary objective in statutory construction is to give effect to the legislature's intent. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We seek the legislature's intent first and foremost in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We rely on the plain meaning of the text unless a different meaning is supplied by legislative definition or is apparent from the context or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008).

The Board points out that the legislature has defined the purpose of state water planning:

> [To] provide for the orderly development, management, and conservation of water resources and preparation for and response to drought conditions, in order that sufficient water will be available at a reasonable cost to ensure public health, safety, and welfare; further economic development; and protect the agricultural and natural resources of the entire state.

WATER § 16.051(a).

Section 16.053(a) contains similar language that directs the regional planning group to develop a plan for sufficient water to be available at a reasonable cost to ensure public health, safety, and welfare; further economic development; and protect the agricultural and natural resources of "that particular region." The premise of Appellees' argument is that the Marvin Nichols Reservoir will not supply water at a reasonable cost when one considers the cost of its probable

adverse impact on Region D's economic development and on Region D's agricultural and natural resources.

The intent of the legislature concerning water planning is broader than the statements in Sections 16.051(a) and 16.053(a). From reading the entire Chapter 16, it is evident that the legislature wants the state water plan to be comprehensive: (1) to assure that future water needs will be met while protecting regional interests and significant natural and agricultural resources in the state and (2) to not have conflicts or internal inconsistencies. The legislature created an interregional dispute resolution process to resolve conflicts that may arise between two or more regional plans. Each region is tasked to identify interregional conflicts or potential conflicts. *See* WATER § 16.053(h)(5); 31 ADMIN. § 357.50(f), (j).

As stated at the outset, the legislature changed water planning into a more democratic "bottom-up" process that involves groundwater districts and regional planning groups. Section 16.053(d) requires the Board to provide guidelines for regional water planning groups. Section 16.051(d) provides that the Board, in adopting guidance principles, should give due consideration "to the construction and improvement of surface water resources and the application of principles that *result in voluntary redistribution of water resources*" (emphasis added). *See* 31 ADMIN. § 358.3(10). One of the principles in former Section 358.3(b) and in current Section 358.3(9) of the Administrative Code is that consideration of all water management strategies shall be "consistent with long-term protection of the state's water resources, agricultural resources, and natural resources."

Section 16.053(h)(7) provides that the Board may approve a regional water plan only if (1) all interregional conflicts have been resolved, (2) the plan includes water conservation practices and drought measures, and (3) "*the plan is consistent*

30

*with long-term protection of the state's water resources, agricultural resources, and natural resources as embodied in the guidance principles adopted under Section 16.051(d)*" (emphasis added). The Board's former Section 357.14 (now Section 357.62), providing for its assistance in negotiations, is an application of the principles in Sections 16.053(h)(7) and 16.051(d) that will assist "in voluntary redistribution of water resources" of areas such as Region D.

No business would plan for a project without considering the costs of that project and its impact on the business's resources. From the plain text of Section 16.051, the legislature expressed its intent that the water planning process should encompass an assessment of a proposed water strategy and its impact. To defer assessment of a water strategy's impact until the Commission's permitting process would encourage bureaucratic inertia and discourage a fair evaluation of the impacts of a water strategy that has been part of a water plan for a period of time and may have been partially funded.

Both Region C and Region D recognize that their plans should involve evaluating the impacts of a water strategy, not simply identifying that strategy. Chapter 7.0 of the Region D water plan described how the Region D water plan "is consistent with" the long-term protection of the State's water resources, agricultural resources, and natural resources and explained the inconsistency of any Marvin Nichols Reservoir (proposed by Region C) in protecting these resources. Region D stated several times in its plan that the Marvin Nichols Reservoir site was not consistent with the long-term protection of the state's water resources, agricultural resources, and natural resources.

In the 2011 Region C water plan at page 4C.14, the Region C water planning group summarized its decision for the next steps: "Evaluate Marvin Nichols Reservoir, Lower Bois d'Arc Creek Reservoir, Lake Ralph Hall, George Parkhouse

Lake (North and South), Lake Columbia, and Lake Tehuacana as potentially feasible strategies."

Region C recognized that, although new reservoirs represent a large source of potential supply for Region C, environmental and economic impacts of reservoir development are concerns that need to be evaluated. The 2011 Region C water plan at page 4C.13 briefly listed those impacts to include inundation of wetlands and other wildlife habitat, including bottomland hardwoods; changes to streamflows and streamflow patterns downstream; impacts on inflows to bays and estuaries; and impacts on threatened and endangered species. Region D identified several impacts and concluded that the impacts of the Marvin Nichols Reservoir outweighed a selection of the strategy. Both regions appear to understand the legislature's intent for the planning process, as expressed in Sections 16.051 and 16.053, to include evaluating the impact of a proposed water strategy.

The Board's regulations outlining guiding principles for regional water plans require that the impacts of water strategies be analyzed. Regional water planning groups must give consideration to threats to agricultural and natural resources and how those threats will be addressed or affected by the water management strategies evaluated in the plan. 31 ADMIN. § 357.30(12).[2] In evaluating potentially feasible water strategies, regional water planning groups are to analyze the "[e]nvironmental factors including effects on environmental water needs, wildlife habitat, cultural resources, and effect of upstream development on bays, estuaries" and "[i]mpacts to agricultural resources." 31 ADMIN. § 357.34(d)(3)(B), (C). Planning groups are to select "cost effective water management strategies, which are consistent with long-term protection of the state's water resources, agricultural

_____

[2]At the time of the trial court's decision, former Section 358.3(b)(3) was in effect; it provided that the planning group must give consideration to "the effect of policies or water management strategies on the public interest of the state, water supply, and those entities involved in providing this supply throughout the entire state."

resources, and natural resources." 31 ADMIN. § 357.35(c). The social and economic impacts of moving water from rural and agricultural areas are to be analyzed. 31 ADMIN. § 357.34(d)(7).

The regional water plan shall include a description of the impacts of the water plan regarding agricultural resources, other water resources of the state, threats to agricultural and natural resources identified pursuant to Section 357.34(d)(5), third-party social and economic impacts resulting from voluntary redistribution of water, major impacts of strategies on water quality, and effects on navigation. 31 ADMIN. § 357.40 (Impacts of Regional Water Plan).

Former Section 357.7(a)(13) provided that the regional plan should contain "a chapter describing how the regional water plan is consistent with long-term protection of the state's water resources, agricultural resources, and natural resources as required in [former] § 357.14(2)(C)." The current Section 357.41 provides that the planning groups shall describe how their regional water plan is "consistent with the long-term protection of the state's water resources, agricultural resources, and natural resources as embodied in the guidance principles in § 358.3(4) and (8) of this title (relating to Guidance Principles)." 31 ADMIN. § 357.41. The guidance principles in Section 358.3 also require that regional planning groups consider the effects of water management strategies.

It is surprising the Board does not consider that the impact of a major water strategy can constitute an interregional conflict, especially here where Region D's plan stated repeatedly that the impact of the proposed Marvin Nichols Reservoir posed a clear interregional conflict and backed the claim with engineering studies.

The Board expresses a concern that, if its definition of "interregional conflict" is rejected, the Board will be mired down in many small conflicts:

> A variety of things could be classified under the heading of "interregional conflict," including differences of opinions on the

regulatory recommendations that planning groups are required to submit to TWDB; or estimates of future needs in small, discrete portions of a planning region; or any number of other facets of the planning process.

We disagree. Region D interprets "interregional conflict" to encompass the type of major conflict here between Region C's proposed major reservoir in Region D and its impact on the resources in Region D. Region D has examined the impacts; Region C has decided to evaluate the impacts of the Marvin Nichols Reservoir in the future as part of its planning process. Region C will recognize there is an interregional conflict when it evaluates the impact of the Marvin Nichols Reservoir strategy. Although we are of the opinion that the term is unambiguous, the Board can solve its dilemma by amending the rule defining an interregional conflict to include its present definition and the present situation where a region has studied the impacts and finds there is a substantial conflict. As earlier stated, each region is tasked by statute to identify interregional conflicts or potential conflicts. *See* WATER § 16.053(h)(5).

Region D's plan had an entire section on the conflict between the Marvin Nichols Reservoir and its negative impacts on the timber industry, other agricultural resources, and economic resources of Region D. Region C's plan contains little comment on the strategy's impact on Region D. A review of the Board's file reflects that, from the time that Region D submitted its plan and had it approved and from the time that Region C submitted its plan and had it approved, less than ninety days elapsed. The short period occurred even though the plans are several hundred pages long with large amounts of data to process and evaluate. A thorough review process will take time. The plain language of the statutes and accompanying regulations indicates that an emphasis should be placed on

34

balancing water uses and supply and their effect on agricultural and natural resources and other economic resources.

By complying with Section 16.053(h)(6) and facilitating coordination between the two regions to resolve the major conflict in the two plans, the Board will be carrying out the purpose of the state water plan. Region C had the assistance of Freese and Nichols, Inc. in preparing its regional water plan. Region D had the assistance of Bucher, Willis & Ratliff Corporation. To assist the respective regions, these firms addressed or planned to address the items the Board rules required the planning groups to address, including those listed above. The ninth item listed by the Board as one required to be addressed in regional plans is "descriptions of the major impacts of recommended strategies on water quality, agricultural resources, natural resources in general, as well as financial demands and other implications of the strategies." Simply having members of these two engineering firms, along with a few representatives from the two regions, for negotiating sessions may lead to a solution that both regions find acceptable and that facilitates a "voluntary redistribution of water resources."

The Board interprets the term "interregional conflict" in Chapter 16 to exist only "when more than one regional water plan relies upon the same water source, so that there is not sufficient water available to fully implement both plans and would create an over-allocation of that source." 31 ADMIN. § 357.10(15). An agency's interpretation of a statute that it is charged with administering is entitled to serious consideration unless the agency's construction is clearly inconsistent with legislative intent. *Tex. Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 21 (Tex. 1996) (citing *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)). We find that the Board's interpretation is clearly inconsistent with legislative intent.

The legislature made clear its intent for regional planning groups to consider important resources early in the planning process. For example, Section 16.053(e)(6) requires that a planning group identify "river and stream segments of unique ecological value" that the regional planning group recommends for protection under Section 16.051.

The legislature intended for the state water plan to play an important role in the Commission's permitting process. In *City of Marshall v. City of Uncertain*, 206 S.W.3d 97 (Tex. 2006), the City of Marshall sought a water-rights amendment to its 1986 certificate of adjudication that recognized a right to divert and use up to 16,000 acre-feet of water from Cypress Creek. The City of Uncertain and others opposed the amendment application and sought a contested-case hearing, which the Commission had held was not required. The Texas Supreme Court concluded that, while TEX. WATER CODE ANN. § 11.122(b) (West 2008) significantly restricted the issues that may be reviewed in a contested-case proceeding, it did not preclude a contested-case hearing:

> Depending upon the particular amendment application, a hearing may be necessary to allow the Commission to assess certain limited criteria other than the application's effect on other water-rights holders and the on-stream environment that the Legislature considered necessary *to protect the public interest, including assessment of water conservation plans, consistency with the state and any approved regional water plans, and groundwater effects.*

206 S.W.3d at 99 (emphasis added). Section 11.134(b)(3)(E) of the Water Code provides that the Commission generally cannot issue new water rights for any use that is inconsistent with the regional plan. TEX. WATER CODE ANN. § 11.134(b)(3)(E) (West 2008).

The Board uses the state water plan for its recommendations to the legislature for the appropriation of state funds. The Board recommended public

funding to purchase land for reservoir sites in the 2007 state water plan; the Marvin Nichols Reservoir was one of the sites. Section 16.051(g-1) provides that "a site is considered to be a designated site of unique value for the construction of a reservoir if the site is recommended for designation in the 2007 state water plan adopted by the board." WATER § 16.051(g-1). The Marvin Nichols Reservoir is now a designated site of unique value for constructing a reservoir. But it does not make sense for the legislature to provide funding for the Marvin Nichols Reservoir site until the interregional conflict raised by Appellees is resolved.

Section 16.053 applies to the regional water planning groups and the Board. The regional planning groups are directly impacted by the statutory language, and they are well-suited to identify interregional conflicts based on the common meaning of that term. The district court owed no deference to the Board's interpretation of an unambiguous term. The district court correctly determined that the two plans contain an interregional conflict that the Board should help the two regions resolve. The Board's second issue is overruled.

*The District Court's Judgment*

From the briefs, it appears that the Board has confused the planning process and the permitting process under the current approach to water planning. The planning process should encompass possible water strategies and the impact those water strategies will have on the agricultural and natural resources of the region involved, especially when an interregional transfer of water is involved. The Region D planning group in its Region D plan made a preliminary case that there is a substantial interregional conflict with Region C's plan, and that should be sufficient for the Board to require the two regional planning groups to attempt to resolve that conflict.

The Board admits that regional water planning groups must consider many of the same issues considered in the permitting process. We agree. This is one. However, even though the information concerning the probable impact of a water strategy will be less detailed in the planning stage than during the permitting stage, the Board and affected regions must resolve interregional conflicts in the planning process.

The Board has been focused on viewing Appellees' suit as one seeking a determination of their individual rights in a permitting process. Perhaps the Board is concerned that the two regions will not resolve the conflict as the Board would, but that becomes a possibility when planning is placed with regional planning groups instead of being a "top-down" plan by the Board. By now, the two regions might have selected alternative strategies for Region C that will not impact Region D to the extent that the Marvin Nichols Reservoir will. But, even if the two regions cannot agree on alternative water strategies for Region C, the Board is in a position to resolve the conflict in the manner that is most consistent with protecting the state's agricultural and natural resources. In view of the statutorily required five-year period for developing a plan, the negotiation period between the two regional planning groups will be limited. At the end of the time period, the Board must resolve the conflict for planning purposes if the two regions cannot reach agreement. Understandably, all parties, including the Board, are in a learning phase in an attempt to meet the legislature's intent and goals for a comprehensive state water plan. That is demonstrated by the Board's rewriting its rules after the decision of the trial court.

Appellees are seeking to have the Board follow the procedure outlined in the statute and in the Board's rules. Assessing a water strategy's impact on agricultural and natural resources and on other economic resources of the state and

then resolving major interregional conflicts during the planning phase will result in a more considered plan. The Board's third issue is overruled.

*This Court's Ruling*

We affirm the judgment of the district court.


                              TERRY McCALL

                              JUSTICE


May 23, 2013

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.